**Reversed and Remanded and Memorandum Opinion filed February 13, 2020.**



In The

# Fourteenth Court of Appeals

### NO. 14-18-00135-CV

## JORGE ROBLES AND WERNER ROBLES, INDIVIDUALLY AND AS HEIRS OF ZOILA ROBLES, Appellants

## V.

## PINNACLE HEALTH FACILITIES XV, LP D/B/A WOODRIDGE NURSING AND REHABILITATION, Appellee

**On Appeal from the 55th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2015-11057**

## MEMORANDUM OPINION

Appellants Jorge Robles and Werner Robles, individually and as heirs of Zoila Robles, appeal from the trial court's dismissal of their healthcare liability lawsuit against appellee Pinnacle Health Facilities XV, LP d/b/a Woodridge Nursing and Rehabilitation (Woodridge). *See* Tex. Civ. Prac. & Rem. Code § 74.351. We hold that the trial court abused its discretion when it granted Woodridge's motion to dismiss because appellants' amended expert report states

with sufficient detail the causal relationship between the alleged failure to meet the standard of care and the alleged harm resulting in Zoila Robles' injuries and death. We therefore sustain appellants' first issue, reverse the trial court's dismissal order, and remand the case to the trial court for further proceedings.[1]

## BACKGROUND

Ms. Robles was 84 when she was transferred from Houston Methodist West Hospital to Woodridge on April 25, 2014. Ms. Robles suffered from osteoarthritis and osteoporosis. These conditions caused Ms. Robles to be chronically bed bound and dependent on the nurses and other staff at Woodridge to transfer her in and out of bed. Woodridge noted upon Ms. Robles' admission that she required both a two-or-more person physical assist and the use of a sling lift for any transfers.

Woodridge put a care plan in place for Ms. Robles four days after she was admitted. Woodridge's care plan indicated that Ms. Robles had a potential for falls and injuries related to assistance with mobility and transfers. The plan also indicated that both a Hoyer lift[2] and a geri-chair[3] were required equipment. Finally, Ms. Robles' care plan specifically stated that all transfers required a two-or-more person physical assist and the use of a sling lift.

Ms. Robles experienced a fall to the floor on July 3, 2014. Her chart noted that

---

[1] Appellants raised two issues on appeal. Because we have sustained appellants' first issue, we need not reach their second issue challenging the trial court's dismissal order. *See* Tex. R. App. P. 47.1.

[2] A specific type of sling lift device for transferring immobile patients.

[3] A geri-chair or geriatric chair is an adjustable recliner. *See Pinnacle Health Facilities XV, LP v. Robles*, No. 14-15-00924-CV, 2017 WL 2698498, at *1, n.2 (Tex. App.—Houston [14th Dist.] June 22, 2017, no pet.).

2

> [d]uring end of shift report, the morning nurse gave report and stated "Resident fell from Hoyer lift during transfer and had informed the Doctor, and order given to transfer resident to Methodist Willowbrook Hospital and the ambulance had already been called & on their way here."

A Woodridge departmental note the next day states that "yesterday afternoon on 7/3/14 resident was being transferred from geri-chair to bed and resident fell. Resident was transferred from floor to bed." Methodist Willowbrook Hospital medical records state that Ms. Robles arrived at the hospital after she suffered a "[f]all, fell from hoyer lift, approx. 3 feet." Nursing notes from the hospital state that "[p]t arrived via ems from Woodridge rehab and nursing home with c/o of faculty [sic] hoyer lift pt. falling and being struck by part of machinery. Pt has multiple skin tear to arms dressed with steri strips." Ms. Robles was pronounced dead less than two hours after she arrived at the hospital. Ms. Robles' family requested an autopsy, but the report does not list a cause of death. Her death certificate however, lists the cause of her death as "blunt trauma of torso and extremities."

Appellants filed suit against Woodridge alleging that Woodridge's negligence proximately caused Ms. Robles' injuries and death. Appellants attached the Chapter 74 expert report and curriculum vitae of Dr. Christopher Davey to their original petition. When Woodridge objected to Dr. Davey's report, appellants filed an amended report. Woodridge objected again. The trial court overruled Woodridge's objections. Woodridge then filed a motion to reconsider its objections along with a motion to dismiss. The trial court denied these motions as well. Woodridge appealed the trial court's denial of the motion to dismiss.

A different panel of this Court ultimately issued a substitute memorandum opinion holding that Dr. Davey's amended report was deficient, but the deficiency was not incurable. *Pinnacle Health Facilities XV, LP*, 2017 WL 2698498, at *4. It

3

remanded the case back to the trial court. *Id.*

Back in the trial court, appellants filed a first amended petition. Appellants also served a second amended expert report along with a motion requesting the thirty-day extension permitted by Chapter 74. The thirty-day extension was granted by an agreed order. Woodridge objected to Dr. Davey's second amended report and appellants served a third amended expert report. Both Dr. Davey's second and third amended reports referenced additional facts not included in his initial reports that the staff was violating Ms. Robles's care plan at the time of the fall by having only one staff member present at the time of the transfer. Dr. Davey's opinion regarding this breach of the standard of care was supported by the affidavit of appellant Jorge Robles. Woodridge objected again and filed another motion to dismiss based on the alleged failure to serve an adequate expert report. The trial court granted Woodridge's motion. This appeal followed.

## ANALYSIS

In their first issue on appeal appellants argue that the trial court abused its discretion when it dismissed their case because Dr. Davey's third amended report meets the Chapter 74 expert report requirements. Woodridge responds that appellants' third amended expert report is still insufficient because it contains no facts explaining how Woodridge's conduct breached the standard of care and is therefore no different from the expert report previously rejected by this Court. As explained below, we agree with appellants that their third amended expert report clears Chapter 74's low threshold that a person bringing a healthcare liability claim against a health care provider must cross to show that his or her claim has merit.

## I. Standard of review and applicable law

We review for an abuse of discretion a trial court's ruling on a motion to dismiss for failure to comply with section 74.351. *Am. Transitional Care Cntrs. of*

4

*Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001); *Univ. of Tex. Med. Branch at Galveston v. Callas*, 497 S.W.3d 58, 62 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). A trial court abuses its discretion if it acts arbitrarily or unreasonably or without reference to guiding rules or principles. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam).

The Texas Medical Liability Act requires a party asserting a healthcare liability claim to file an expert report and serve it on each party not later than 120 days after the petition is filed. Tex. Civ. Prac. & Rem. Code § 74.351(a). Under the statute, an expert report means a written report that provides "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician . . . failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." Tex. Civ. Prac. & Rem. Code § 74.351(r)(6). If a plaintiff does not timely serve an expert report meeting the required elements, the trial court must dismiss the healthcare claim on motion of the affected healthcare provider. *See id.* §§ 74.351(b), (l); *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 513 (Tex. 2017) (per curiam); *Gannon v. Wyche*, 321 S.W.3d 881, 885 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). If elements of the report are found deficient, as opposed to absent, the court may grant a thirty-day extension to cure the deficiency. Tex. Civ. Prac. & Rem. Code § 74.351(c); *Gannon*, 321 S.W.3d at 885.

Although the expert report need not marshal all of the plaintiff's proof, it must include the expert's opinions on the three statutory elements of standard of care, breach, and causation. *Palacios*, 46 S.W.3d at 878-79; *Kelly v. Rendon*, 255 S.W.3d 665, 672 (Tex. App.—Houston [14th Dist.] 2008, no pet.). The report need not use "magic words" and does not have to meet the same standards as

evidence offered in a summary-judgment proceeding or trial. *See Kelly*, 255 S.W.3d at 672 ("The expert report is not required to prove the defendant's liability."); *see also Jelinek v. Casas*, 328 S.W.3d 526, 540 (Tex. 2010) (stating no magic words are required). Bare conclusions or speculation, however, will not suffice. *See Wright*, 79 S.W.3d at 52, 53; *Humble Surgical Hosp., LLC v. Davis*, 542 S.W.3d 12, 23 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

To constitute a good-faith effort to comply with the expert report requirement, the report must provide enough information to fulfill two purposes of the statute: (1) inform the defendant of the specific conduct the plaintiff has called into question and (2) provide a basis for the trial court to conclude that the claims have merit. *Baty v. Futrell*, 543 S.W.3d 689, 693–94 (Tex. 2018). This constitutes a low threshold that a person bringing a claim against a health care provider must cross to show that his or her claim has merit. *McAllen Hosp., L.P. v. Gonzalez*, 566 S.W.3d 451, 456 (Tex. App.—Corpus Christi 2018, no pet.); *see Loaisiga v. Cerda*, 379 S.W.3d 248, 264 (Tex. 2012) (Hecht, J. concurring in part and dissenting in part) ("We have held that the standard for adequacy of a report is lenient, and that leave to cure any deficiencies in a report must be freely given."); *Pettway v. Olvera*, No. 14-17-00532-CV, 2018 WL 4016949, at *3 (Tex. App.—Houston [14th Dist.] Aug. 23, 2018, pet. denied) (mem. op.) ("Accordingly, the Texas Supreme Court has encouraged trial courts to liberally construe expert reports in favor of plaintiffs.") (internal quotation marks omitted).

The goal of section 74.351 is to "deter frivolous lawsuits by requiring a claimant early in litigation to produce the opinion of a suitable expert that his claim has merit." *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017) (internal quotation marks omitted). The purpose of the statute is not to dispose of potentially meritorious claims. *Abshire v. Christus Health Se.*

*Tex. d/b/a Christus Hosp.-St. Elizabeth*, 563 S.W.3d 219, 223 (Tex. 2018). A frivolous claim is not the same as an ultimately unsuccessful one. *Peabody v. Manchac*, 567 S.W.3d 814, 821 (Tex. App.—Houston [14th Dist.] 2018, no pet.). Showing that a claim has merit requires an opinion that the alleged negligence of the medical provider proximately caused the plaintiff's injury. *See Zamarripa*, 526 S.W.3d at 460. Although the plaintiff need not actually prove the claim with the expert report, the report must show that the expert is of the opinion that the plaintiff can do so, including as to both foreseeability and cause-in-fact. *Id.*

An expert's mere *ipse dixit* regarding causation will not suffice; the expert must explain the basis of his or her conclusions, showing how and why a breach of the standard of care caused the injury. *See id*; *Jelinek*, 328 S.W.3d at 536. The conclusion must be linked to the facts of the case and cannot contain any gaps in the chain of causation. *See Wright*, 79 S.W.3d at 52; *Davis*, 542 S.W.3d at 23. This does not mean however, that an expert's report must be complicated or complex, so long as it meets the statutory requirements. *See Baty*, 543 S.W.3d at 697 ("Because his report identifies the 'conduct being called into question' — inserting the needle into the optic nerve — and provides the trial court a basis to conclude Baty's claims have merit, it satisfies the good-faith effort the statute requires."). We determine whether an expert opinion is sufficient under section 74.351 by considering the opinion in the context of the entire report, rather than taking statements in isolation. *See Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 144 (Tex. 2015) (per curiam).

## II. Appellants' amended expert report meets the section 74.351 requirements.

Appellants argue on appeal that Dr. Davey's amended expert report meets the statutory requirements because it includes his opinions on the three statutory

elements of standard of care, breach, and causation. *See* Tex. Civ. Prac. & Rem. Code § 74.351(r)(6). In appellants' view, Dr. Davey's report informs Woodridge of the specific conduct they have called into question, the failure to meet the standard of care requiring two staff persons assisting with any transfer involving Ms. Robles, and how that failure caused Ms. Robles' injuries and death. In his report, Dr. Davey states:

> Additionally, whether or not the device failed and whether or not it was being used properly, the Woodridge and its staff breached the standard of care by failing to prevent Ms. Robles from falling three feet to the floor and further breached the standard of care by failing to prevent the Hoyer lift from striking her once she was on the floor. The staff that was assisting in the transfer breached the standard of care by either failing to have two staff members present at the time of the transfer or by failing to adequately respond once Ms. Robles begin [sic] to fall. In my opinion, it [is] more likely than not given what is documented that only one staff member was present at the time of the fall. I have been provided an affidavit by Mr. Jorge Robles Santizo which states that he was told immediately after the fall that only one staff member was present. If two staff members were present and complying with the standard of care, they would have supported Ms. Robles before she fell and prevented her from being struck by falling machinery. Specifically, when a patient is being transferred from a geri-chair to a bed as occurred in this case, the standard of care requires two staff members be present. At the beginning of the transfer, one care giver should be standing behind the chair and the other directly in front of it. Once the sling is properly placed, one care giver should stand behind the chair as the other positions the lift over the wheelchair. Once the sling is properly positioned and attached to the Hoyer lift in accordance with the principles set forth above, the standard of care requires that as one care giver maneuvers the Hoyer lift, the other care giver stands behind the sling (so that the caregivers are facing each other), securing the sling with two hands near the resident's shoulder. This places the caregiver's hands at a ready position should trouble be encountered. This allows the care giver to "catch" the resident should the resident start to fall. As the resident moves toward the bed, the care giver securing the resident should, in

8

accordance with the standard of care, move to the resident's side, maintaining contact with the sling. Again this allows the care giver to break the resident[']s fall if a problem is encountered, which is required by the standard of care. This should occur until the resident is over the bed. At that point the care giver should, using the resident's legs, rotate the resident over the bed as the other caregiver lowers the lift. When this occurs, a resident will not experience a three foot fall to the ground that is sufficient to cause the injuries Ms. Robles did in this case and then be struck by a lift. When only one staff member is present though, there is no one to catch the resident or break the resident[']s fall as the caregiver has his/her hands on the device and not the resident. Given what occurred in this case, it is more likely than not only one staff member was present who was at the lift at the time of the fall instead of supporting the resident as required by the standard of care. Had there been two staff members acting in accordance with the standard of care they would have supported/caught Ms. Robles before she fell three feet to the ground and would have prevented a piece of the device from striking her. Furthermore, the fact only one staff member was present at the time of the transfer despite the fact that having two staff members present at the time of transfer is a basic principle of safe transfer techniques, lends additional credence to my opinion that it is more likely than not this fall occurred because the device was not being used properly in accordance with the standard of care as explained in the preceding paragraph.

It is my opinion, based on a reasonable degree of medical probability, that the breaches of the standard of care identified above proximately caused Ms. Robles's fall, injuries, and death.

. . .

Finally, had two staff members been present, and the standard of care followed, it is more likely than not that Ms. Robles would not have fallen three feet to the floor and been struck by a piece of the lift as it is more likely than not that she would have been caught and supported as the device begin [sic] to fail because a care giver would have already had hands on Ms. Robles and that the device would not have struck her because the other care giver would have had hands on the device. Therefore, had the standard of care set forth in this report been met, it is more likely than not that Ms. Robles would not have fallen and would not have been struck by the device or any piece of it.

9

According to the records, as a result of this fall, Ms. Robles suffered several lacerations, as well as bruising. The injuries she sustained resulted in calling EMS services, as well as care and treatment at a local hospital. Therefore, the breaches of the standard of care identified above caused, more likely than not, the medical expenses which otherwise would have been unnecessary. It is more likely than not, based on my experience treating patients like Ms. Robles that these injuries she suffered would have been painful and the experience of being taken to a local emergency department also, more likely than not, would have resulted in mental anguish. The autopsy report in this case did not reveal any obvious sign of death. However, there are really only two plausible possibilities: (1) that she died from shock after experiencing blunt force trauma from the fall, as is set forth in the death certificate, or (2) that she died from an underlying infection that went unrecognized. I agree with the physician who authored the death certificate that it is more likely than not that Ms. Robles died from blunt force trauma to the extremities. However, as will be set forth in greater detail below, even if she died from an underlying infection that went unrecognized, this too would be proximately caused by the negligence of Woodridge Nursing and Rehabilitation and its staff.

I believe it is more likely than not that Ms. Robles died as a result of this fall. She died within a few hours of this fall. It therefore makes sense that the medical examiner who signed the death certificate and is trusted with determining the cause of death would conclude as I do that she died of blunt force trauma causing her to go into shock with subsequent cardiac arrest. If a person fall[s] from a height, then dies shortly afterwards, it is reasonable to conclude that it is more likely than not they died from the fall-this is why the death certificate lists this as an accidental death, (as opposed to a natural death). Deaths resulting from blunt force trauma are some of the most common cases encountered by pathologists and I saw these cases in my training. There is no dispute that Ms. Robles suffered a blunt force trauma when she fell. There is also not a dispute that this fall caused injuries (lacerations and abrasions) which are commonly seen in blunt force trauma death. There were other injuries such as fractured ribs that are also consistent with the fall. It is well understood that falls and blunt force trauma that results in falls can lead to cardiac arrest that is not apparent on autopsy. For example, it is known that blunt force trauma

damages tissues and as that tissue is absorbed, the body can be overwhelmed with toxins which in turn leads to shock and cardiac arrest which will not be evident on autopsy. Based on the autopsy findings, Ms. Robles' presentation, and the timing of the cardiac arrest, I believe that it is most likely what occurred here. Other phenomena commonly discussed in the literature is blunt cardiac injury which also is not typically evidenced by autopsy but is instead presumed by circumstances of the blunt force trauma. Interestingly, blunt cardiac injury resulting in arrhythmia of the heart may be delayed, initially presenting as hypotension and difficulty breathing as occurred in this case. Regardless of the precise mechanism, it is far more likely than not that the fall Ms. Robles sustained caused her to die when she did.

As quoted above, Dr. Davey's report explains the required standard of care, the presence of two staff persons during a patient transfer. Dr. Davey also explains in detail the role of each staff person involved in a patient transfer using a Hoyer lift. Dr. Davey then explains how the presence of only a single staff person breached that standard. Finally, Dr. Davey explains how Woodridge's breaches caused Ms. Robles' injuries. We conclude Dr. Davey's report meets the statutory requirements because it informs Woodridge of the specific conduct appellants have called into question, and it provides a basis for the trial court to conclude that their claims have merit. *See Baty*, 543 S.W.3d at 697 (explaining how challenged expert report met the statutory requirements and stating that "additional detail is simply not required at this stage of the proceedings."); *Palacios*, 46 S.W.3d at 880 ("Whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently.").

On appeal, Woodridge responds to appellants' arguments by asserting that Dr. Davey's report is deficient because it relies on an affidavit "from one of the plaintiffs in the case." But, if a medical expert preparing a Chapter 74 expert report is allowed to rely on the unrebutted allegations contained in a plaintiff's

11

unsworn petition, we see no reason why an expert cannot similarly rely on a plaintiff's affidavit testimony. *See Loaisiga v. Cerda*, 379 S.W.3d 248, 261 (Tex. 2012) ("Thus, we do not see why an expert, in formulating an opinion, should be precluded from considering and assuming the validity of matters set out in pleadings in the suit, absent a showing that the pleadings are groundless or in bad faith or rebutted by evidence in the record."). Additionally, to the extent Woodridge challenges the credibility of Dr. Davey's report because it is based in part on a plaintiff's affidavit, we point out that it is not this Court's job at this stage of the litigation to weigh the credibility of the expert's report. *Abshire*, 563 S.W.3d at 226.

Woodridge next argues that Dr. Davey's report is deficient because his statement of the standard of care is conclusory, or simply incorrect. A conclusory statement is one that expresses a factual inference without providing the underlying facts to support that conclusion. *See Padilla v. Metro. Transit Auth. of Harris Cty.*, 497 S.W.3d 78, 85 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (addressing allegation affidavit was conclusory in inverse condemnation suit). As quoted above, we conclude that Dr. Davey set forth sufficient facts to support his statement of the standard of care as well as his conclusion that Woodridge violated the standard of care by having only a single staff person present when Ms. Robles fell. *See Chava v. Hubbard*, No. 14-17-00158-CV, 2018 WL 1918462, at * 8 (Tex. App.—Houston [14th Dist.] Apr. 24, 2018, no pet.) (mem. op.) (rejecting defendant doctor's argument that medical expert's report was conclusory). We also reject Woodridge's argument that Dr. Davey's report is conclusory because he changed, without explanation, his statement of the standard of care regarding the number of staff persons required for patient transfers such as the one at issue here. (BR23-4) Having reviewed each of Dr. Davey's expert reports, we conclude that

he did not change his statement of the standard of care regarding the two-staff-person requirement because it was included in each of his reports found in the appellate record. In addition, Dr. Davey adequately explained that he was able to specifically opine in his third amended report that Woodridge breached the standard of care by not having two staff persons performing the transfer of Ms. Robles because he had received additional information, "the affidavit from one of Ms. Robles' family members."

Finally, Woodridge suggests Dr. Davey's report is deficient because it misstates the standard of care, or it creates an onerous burden on entities such as itself. But, the issue at this stage of the litigation is not the correctness of Dr. Davey's report or whether the standard of care at issue is onerous. *See Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 516 (Tex. 2017) (stating that "[t]he court of appeals' real concern appears to be the believability of Dr. Albright's articulated standards of care, not the manner in which she stated them. Our inquiry is not so exacting."); *Methodist Hosp. v. Shepherd-Sherman*, 296 S.W.3d 193, 200 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (holding fact that evidence later proves expert wrong does not provide basis for holding report insufficient).

We conclude that Dr. Davey's report adequately addresses at least one theory of liability against Woodridge: Woodridge breached the standard of care requiring the use of at least two staff persons to carry out a patient transfer such as the one at issue here and that this breach proximately caused harm to Ms. Robles. That is all that is required for the case to proceed at this stage of the litigation. *Methodist Hosp. v. Addison*, 574 S.W.3d 490, 502 (Tex. App.—Houston [14th Dist.] 2018, no pet.). Keeping in mind the low threshold that a section 74.351 medical expert report must cross and the report is simply a preliminary method to

show that a plaintiff has a viable cause of action that is not frivolous or without expert support, we hold that the trial court abused its discretion when it dismissed appellants' claims against Woodridge. *See Harvey v. Kindred Healthcare Operating, Inc.*, 578 S.W.3d 638, 654 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (concluding trial court abused discretion when it granted motion to dismiss because plaintiff's medical expert report met expert report requirements found in section 74.351). We therefore sustain appellants' first issue on appeal.

## CONCLUSION

Having sustained appellants' first issue on appeal, we reverse the trial court's order dismissing appellants' lawsuit and remand the case to the trial court for further proceedings.


/s/    Jerry Zimmerer
       Justice


Panel consists of Justices Wise, Zimmerer, and Spain.