**Reversed and Remanded and Opinion filed May 24, 2016.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-14-00938-CV

---

### JOSE GERARDO PADILLA, GIOVANNA PADILLA, AND HOUSTON BEST FOODS & SERVICES, LLC D/B/A DONERAKI FULTON, Appellants

### V.

### METROPOLITAN TRANSIT AUTHORITY OF HARRIS COUNTY, Appellee

---

**On Appeal from the County Civil Court at Law No. 4
Harris County, Texas
Trial Court Cause No. 1010704**

---

### O P I N I O N

Appellants Jose Gerardo Padilla, Giovanna Padilla, and Houston Best Foods & Services, LLC d/b/a Doneraki Fulton appeal from the trial court's order dismissing their inverse condemnation lawsuit against appellee Metropolitan Transit Authority of Harris County (Metro) for lack of subject-matter jurisdiction. Appellants owned and operated a Doneraki restaurant on Fulton Street in Houston,

Texas. Appellants alleged that Metro's construction of a light rail line along Fulton blocked access to the restaurant for significant periods of time, forcing the closure of the restaurant. Appellants sued Metro, alleging, among other claims, that they were entitled to compensation for the total, temporary blockage of access under Article 1, section 17 of the Texas Constitution.

In multiple issues on appeal, appellants argue that the trial court erred when it dismissed their inverse condemnation lawsuit. Because the jurisdictional evidence raised a genuine issue of material fact on both Metro's intent and on whether Metro's construction of the light rail line temporarily blocked all access to the Doneraki restaurant and thereby damaged appellants' property, we hold that the trial court erred when it granted Metro's motion to dismiss. We therefore reverse the trial court's order of dismissal and remand the case to the trial court.

### BACKGROUND

**A.    Access to appellants' restaurant before Metro's North Line project began**

Appellants' restaurant was located on the southeast corner of the intersection of Fulton Street and Halpern Street. Fulton runs along the west side of the restaurant property and Halpern borders the north side of the restaurant property. The property had a restaurant building as well as a paved parking area accessible from Halpern Street. To supplement the on-site parking area, appellants leased a separate surface parking lot a short distance south of the restaurant on Fulton Street. The public entrance into the restaurant building fronted on Fulton Street.

Prior to the construction, Fulton Street adjacent to the restaurant consisted of one northbound lane with an additional six-foot wide bike lane, one southbound lane with an additional six-foot wide bike lane, and a curbed median. The intersection of Fulton and Halpern was controlled by a traffic light. The following

2

traffic movements were permitted at that intersection prior to the construction project: (1) vehicles traveling southbound on Fulton could continue through the intersection, make a right turn into an apartment complex, make a left turn onto Halpern and travel east, or make a u-turn and travel north on Fulton; (2) vehicles traveling northbound on Fulton could continue straight through the intersection, make a right turn onto Halpern and travel east, make a left turn into the apartment complex, or make a u-turn and travel south on Fulton; and (3) vehicles traveling westbound on Halpern could continue through the intersection into the apartment complex, make a right turn onto Fulton and travel north, or make a left turn onto Fulton and travel south.

## B.     The North Line construction plans

Metro began construction of a five-mile extension of an existing light rail line, referred to as the North Line, in the spring of 2009.  As part of the rail-line extension, Metro had to relocate public and private utilities, widen and reconstruct portions of North Main, Boundary, and Fulton streets, install new traffic signals and associated wires and cables, and construct the light rail guideway and transit stations.  Although Metro did none of the actual work on the project, the work was performed by private companies operating under contract with Metro.  Metro's agreement with its chosen builder, which eventually became Houston Rapid Transit Joint Venture (HRT), is set forth in six documents that we refer to collectively as the Contract.  The Contract admonished HRT not to use private property in the construction of the North Line or to engage in acts of negligence that would harm property owners along the route.  The Contract also urged HRT to minimize impacts to adjoining property owners:

> Design-Builder [HRT] shall ensure that all of its activities and the activities of Subcontractors are undertaken in a manner that will minimize the effect on surrounding property and the public to the

3

maximum extent practicable. Without limiting the foregoing, Design-Builder shall fully and timely implement the provisions on minimizing impacts of noise, dust, vibration, construction lighting, traffic and pedestrian diversion, and other construction-related activities to properties, businesses, and residents adjacent to the Work and to the general public set forth in the Contract Documents.

The Contract also admonished HRT to maintain reasonable access to the properties adjoining the North Line, providing as follows: "The Facility Provider [HRT] shall provide and maintain vehicle and pedestrian access to all public and private properties during the construction, except for limited short periods of time when full and complete access is not possible." HRT retained the discretion, however, to construct the North Line in the manner it deemed most appropriate.

### C. Construction adjacent to the restaurant

Beginning in January 2011 and continuing through approximately June 2011, HRT reconstructed the northbound lane of Fulton adjacent to the restaurant and nearby separate parking lot. Metro did not acquire any portion of the restaurant property as part of the North Line project.

According to Jose Padilla, however, the construction prevented customers from accessing the restaurant property, blocking all of the entrances and exits for months at a time. Additionally, access to the property during construction was all but impossible for reasonably competent drivers of ordinary passenger cars.

Although appellants continued, for a time, to operate the restaurant for those customers able to access the property, appellants asserted that Metro's construction activity prevented appellants' trash company from removing trash between the beginning of February and the latter part of March 2011. The resulting foul-smelling pile of trash adjacent to the restaurant further reduced business. Appellants also contended that construction workers broke a gas line in

4

approximately January 2011 and ruptured a water line in May 2011, causing a total temporary loss of the use of the property in both instances.

## D. Access to the restaurant following construction

The construction of the North Line and City of Houston traffic safety requirements resulted in permanent restrictions on traffic movements in the area. The intersection of Fulton and Halpern has been closed to east-west through traffic. The following traffic movements are now permitted at that intersection: (1) vehicles traveling southbound on Fulton may continue through the intersection or make a right turn into the apartment complex; (2) vehicles traveling northbound on Fulton may continue through the intersection or make a right turn onto Halpern and travel east; and (3) vehicles traveling westbound on Halpern must make a right turn onto Fulton and travel north. Although the Fulton/Halpern intersection is closed to east-west through traffic, some intersections in the area remained open to east-west through traffic. The open intersections include the Fulton/Hays intersection, located approximately 700 feet north of the restaurant, and the Fulton/Boundary intersection, located approximately 1,150 feet south of the restaurant.

According to appellants, once construction was completed, access to the restaurant was possible but difficult. Although some access remained, appellants alleged that the business could not survive the more than $500,000 in losses suffered during construction, and the restaurant was closed in November 2011.

## E. The litigation

Appellants filed an inverse condemnation lawsuit against Metro pursuant to Article 1, Section 17 of the Texas Constitution. Appellants sought to recover lost profits allegedly caused by the temporary, total denial of access to the restaurant during the construction of the North Line. Appellants also sought to recover for

5

the permanent diminution in the value of the property caused by the alleged material and substantial impairment of access once the North Line construction was completed.

Metro responded by filing a motion to dismiss for lack of jurisdiction. Metro argued that the trial court did not have jurisdiction over appellants' inverse condemnation suit because: (1) any impairment appellants suffered was not material and substantial; (2) appellants' losses were "community damages" and therefore not compensable under Texas law; (3) Metro did not have the required intent to effect a taking; and (4) Metro enjoys sovereign immunity in all circumstances unless its immunity has been waived by a specific act of the Legislature.

Appellants filed a response in opposition to Metro's motion to dismiss. Appellants attached an affidavit to their response stating that access to the restaurant was: (1) totally blocked during the construction adjacent to its location; and (2) permanently impaired after construction. The trial court granted Metro's motion to dismiss, and this appeal followed.

## ANALYSIS

Appellants raise three issues on appeal challenging the trial court's dismissal of their suit against Metro. We address these issues together.

## I. Standard of review and applicable law

A governmental unit's plea to the jurisdiction may challenge either the plaintiff's pleadings or the existence of jurisdictional facts. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226–27 (Tex. 2004). When, as here, the governmental unit challenges the existence of jurisdictional facts, and the parties submit evidence relevant to the jurisdictional challenge, we must consider that

6

evidence as necessary to resolve the jurisdictional issues raised. *Id.* at 227–28; *Olivares v. Brown & Gay Eng'g, Inc.*, 401 S.W.3d 363, 369 (Tex. App.—Houston [14th Dist.] 2013), *aff'd*, 461 S.W.3d 117 (Tex. 2015); *see Perez v. City of Dallas*, 180 S.W.3d 906, 913 (Tex. App.—Dallas 2005, no pet.) (examining the jurisdictional evidence submitted by both parties in the litigation to resolve governmental unit's plea to the jurisdiction). This evidence includes the nonmovant's discovery responses. *See State v. Fiesta Mart, Inc.*, 233 S.W.3d 50, 56 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) ("The trial court properly considered Fiesta's [discovery] responses in determining whether it had jurisdiction.").

If the evidence raises a fact issue as to jurisdiction, the governmental unit's plea must be denied because the issue must be resolved by the trier of fact. *Miranda*, 133 S.W.3d at 227–28. If the relevant evidence is undisputed or fails to present a jurisdictional fact issue, however, the court should rule on the plea as a matter of law. *Id.* The standard of review for a plea to the jurisdiction based on evidence generally mirrors that of a motion for summary judgment. *Quested v. City of Houston*, 440 S.W.3d 275, 279–80 (Tex. App.—Houston [14th Dist.] 2014, no pet.). We therefore must credit evidence favoring the nonmovant and draw all reasonable inferences in the nonmovant's favor. *Id.*

The Texas Constitution provides that no person's property "shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made . . . ." Tex. Const. art. I, § 17. Thus, the Texas Constitution waives governmental immunity from suit for the taking, damaging, or destruction of property for public use and requires compensation for such destruction. *State v. Bhalesha*, 273 S.W.3d 694, 697 (Tex. App.—Houston [14th Dist.] 2008, no pet.). To prove an inverse condemnation claim, a claimant must show that a

7

governmental actor intentionally performed acts that resulted in the taking, damaging, or destruction of its property. *Smith v. City of League City*, 338 S.W.3d 114, 122 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (citing *State v. Holland*, 221 S.W.3d 639, 643 (Tex. 2007)). For purposes of article I, section 17, a governmental entity acts intentionally if it knows either that a specific act was causing identifiable harm or that specific property damage was substantially certain to result from the entity's action. *City of San Antonio v. Pollock*, 284 S.W.3d 809, 821 (Tex. 2009). A governmental entity is substantially certain that its actions will damage property when the damage is necessarily an incident to or necessarily a consequential result of the governmental entity's action. *Id.* An awareness that damage is a mere possibility is not evidence of the governmental entity's intent. *Id.* The government's knowledge must be determined as of the time it acted, not with the benefit of hindsight. *Id.*

Not all damage caused by government construction projects is compensable. Property owners may not recover for injuries sustained in common with the community where the property is situated, such as damage from noise, dust, increased traffic, diversion of traffic, circuity of travel, and other inconveniences incident to road or highway construction. *See Felts v. Harris County*, 915 S.W.2d 482, 485 (Tex. 1996); *State v. Whataburger, Inc.*, 60 S.W.3d 256, 260 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) ("Increased access to property often enhances its value; the inconvenience and temporary impairment which a property owner suffers when street improvements are made is simply an incident of city life and must be endured.").

Damages peculiar to a property owner, such as impaired access, are not barred by the concept of community injury. *State v. Heal*, 917 S.W.2d 6, 9 (Tex. 1996). To obtain compensation for impairment of access, a plaintiff must establish

8

that the governmental entity materially and substantially impaired access rights to his property. *Whataburger, Inc.*, 60 S.W.3d at 261. More specifically, the plaintiff must show that there has been: (1) a total but temporary restriction of access; (2) a partial but permanent restriction of access; or (3) a temporary limited restriction of access brought about by an illegal activity or one that is negligently performed or unduly delayed. *Id.* If the plaintiff does so, the property owner is entitled to be compensated for the lost profits arising from the denial of access. *Id.* Whether there has been a material and substantial impairment of access is a question of law for the court. *Heal*, 917 S.W.2d at 9.

## II. The jurisdictional evidence raises a fact issue on appellants' inverse condemnation claim against Metro.

In its motion to dismiss, Metro argued that "the jurisdictional facts do not support a cause of action for which Metro's immunity has been waived." Many of Metro's arguments attacked appellants' now-abandoned claim that the North Line construction caused a permanent, partial impairment of access to their restaurant.[1] With respect to appellants' remaining claim that the North Line construction caused a temporary, total denial of access to the restaurant, Metro made two arguments. First, Metro asserted that appellants' complaints alleged problems arising out of the construction that are non-compensable community damages. Second, Metro argued that the jurisdictional evidence established that it did not have the necessary intent to take or damage appellants' property. In response, appellants argued that the jurisdictional evidence raised a genuine issue of material fact on whether the construction caused a temporary, total denial of access to their

---

[1] Appellants initially alleged claims for both a permanent, partial restriction of access and a temporary, total denial of access. During oral argument, appellants conceded that we no longer need to consider the permanent, partial restriction of access claim in this appeal. Therefore, the only claim still at issue here is appellants' claim that Metro's construction of the North Line project created a temporary, total denial of access.

restaurant as well as on Metro's intent. We examine each argument in turn.

**A.    There is a fact issue on whether the construction of the North Line caused a temporary, total denial of access to appellants' restaurant.**

In its motion to dismiss, Metro argued that it established as a matter of law that the North Line construction did not cause a temporary, total denial of access to appellants' restaurant. Metro attached to its motion the affidavit of Michael Bruce Krantz, the "Senior Project Director of METRORail Expansion Capital Programs." In that role, Krantz was "responsible for monitoring and reporting on the status of the Metro light rail projects and interfacing with [HRT], its subcontractors, and the City of Houston . . . regarding those projects." Krantz also stated that as a result of his work, he was "familiar with the planning, design, and construction of the extension of Metro's Red Line light rail line 5.3 miles north, from the University of Houston–Downtown to the Northline Transit Center." According to Krantz, although the construction caused occasional disruptions along the route, HRT always made alternative arrangements so customers could access appellants' restaurant and its parking.[2] Because HRT always made arrangements for access to the restaurant and parking areas for the use of the restaurant's patrons, Metro argued that appellants' allegations regarding access were nothing more than the type of non-compensable inconveniences associated with all government transportation projects, and therefore its immunity was preserved.

Appellants attached an affidavit of appellant Jose Gerardo Padilla to their response to Metro's motion to dismiss. According to Padilla, he was in charge of the Fulton Doneraki restaurant and was present at the restaurant "virtually every

---

[2] These disruptions included a six-day closure of the Fulton Street access to the restaurant's separate Fulton Street parking area. While admitting the closure, Krantz stated that HRT arranged an alternative access point to that parking lot as well as the use of another parking lot in the area during the entrance closure.

10

day during Metro's construction of a light rail route in the vicinity of our restaurant." Among other things, Padilla stated that "for months[] at a time all the entrances and exits were blocked." Padilla continued that "there were many times when the restaurant access was blocked for long periods because road work and utility work around the restaurant was left unfinished with no crews working at all." In appellants' view, the trial court erred when it granted Metro's motion to dismiss because Padilla's affidavit generated a fact issue on the question whether access to the Doneraki restaurant was totally blocked for temporary periods during the light rail construction project. Metro responds, as it did in the trial court, that Padilla's affidavit is not competent evidence because his statements are conclusory.

A conclusory statement is one that expresses a factual inference without providing underlying facts to support that conclusion. *See, e.g., Arkoma Basin Expl. Co. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 389 n.32 (Tex. 2008); *Dolcefino v. Randolph*, 19 S.W.3d 906, 930 & n.21 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (holding statement in affidavit that "this was false and defamatory and has injured me in my profession" was conclusory). Affidavits containing conclusory statements that fail to provide the underlying facts supporting those conclusions are not proper summary judgment evidence. *Nguyen v. Citibank, N.A.*, 403 S.W.3d 927, 931 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). To avoid being conclusory, an affidavit must contain specific factual bases, admissible in evidence, from which any conclusions are drawn. *Southtex 66 Pipeline Co. v. Spoor*, 238 S.W.3d 538, 542 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). In Metro's view, Padilla's statements are conclusory because his affidavit does not include necessary additional facts—such as describing exactly what was blocking access to the restaurant—supporting his statement that

11

access was blocked.

We hold that Padilla's affidavit is not conclusory. Padilla's statement that "for months[] at a time all the entrances and exits were blocked" by Metro's construction is a statement of fact, not an inference from unstated facts. *See Arkoma Basin Expl. Co.*, 249 S.W.3d at 389 n.32. Moreover, Padilla provided background facts that explain the basis of his factual statement that access was blocked. Padilla stated that he was in charge of the restaurant and was present at the restaurant "virtually every day" during the construction project. *See Southtex 66 Pipeline Co.*, 238 S.W.3d at 543 ("A person's position or job responsibilities can peculiarly qualify him to have personal knowledge of facts and establish how he learned of the facts."). Padilla also explained that road work and utility work around the restaurant was left unfinished for long periods, with no crews working at all. The cases Metro cites do not support its contention that minute detail is necessary to render testimony regarding blocked access non-conclusory.[3] Because Padilla's affidavit is competent evidence, we hold that it raises a genuine issue of material fact on whether Metro's North Line construction activities caused a temporary, total denial of access to appellants' restaurant. *See Whataburger, Inc.*, 60 S.W.3d at 261.

## B. There is a fact issue on Metro's intent.

To establish an inverse condemnation claim, a claimant must show that a governmental actor acted intentionally when it took or damaged property for a

---

[3] *See Brookshire Katy Drainage Dist. v. Lily Gardens, LLC,* 333 S.W.3d 301, 308–09 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (holding affidavit statement of District's president interpreting District's legislative authority was legal conclusion and thus not competent summary judgment evidence); *Stryker v. Broemer*, No. 01-09-00317-CV, 2010 WL 4484176, at *5 (Tex. App.—Houston [1st Dist.] Nov. 10, 2010, pet. denied) (holding plaintiff's statement that she suffered mental anguish as a result of attorney's failure to settle case was conclusory); *Southtex 66 Pipeline Co.*, 238 S.W.3d at 543–45 (holding attorney/witness did not provide facts explaining how he had expertise to interpret Texas Railroad Commission documents).

12

public use. *Smith*, 338 S.W.3d at 122. Intent may be shown by circumstantial evidence. *Harris County Flood Control Dist. v. Kerr*, No. 13-0303, 2015 WL 3641517, at *3 (Tex. June 12, 2015). Metro argued in its motion to dismiss that the trial court did not have jurisdiction because the jurisdictional evidence established conclusively that it did not have the requisite intent. To defeat intent, Metro relied on its contract with HRT and the argument that it was HRT and HRT's subcontractors, not Metro, that actually performed the work causing any denial of access. Because the contract instructed HRT to minimize the effects of construction on private property owners, Metro asserted that it did not know damage beyond the typical disruptions associated with construction was substantially certain to result.

In *City of Dallas v. Jennings*, the Supreme Court of Texas held that a governmental entity may be held liable for compensation under article 1, section 17 of the Texas Constitution if it (1) knows that a specific act is causing identifiable harm; or (2) knows that the specific property damage is substantially certain to result from an authorized governmental action—that is, that the damage is necessarily an incident to, or necessarily a consequential result of, the government's action. 142 S.W.3d 310, 314 (Tex. 2004). Under this standard, a governmental entity responsible for a construction project cannot avoid its constitutional obligation to compensate private property owners for resulting damage simply by proving that the project was carried out by contractors rather than the entity itself. *See City of Dallas v. Zetterlund*, 261 S.W.3d 824, 831–32 (Tex. App.—Dallas 2008, no pet.) (rejecting plea to the jurisdiction because city failed to prove as a matter of law that it did not know about or authorize actions of contractors).

Here, it is undisputed that construction of the North Line was an authorized

13

Metro project. Metro's contractual instruction to minimize the impact of construction on surrounding property owners indicates that it anticipated such impact. In addition, Krantz—Metro's Senior Project Director responsible for monitoring and reporting on the status of the project—stated in his affidavit that he monitored the project regularly, and he professed detailed personal knowledge of facts regarding access to appellants' property. On this record, Metro's argument to the trial court regarding use of contractors does not prove as a matter of law that Metro lacked knowledge that construction (1) was causing identifiable harm to appellants, or (2) was substantially certain to result in specific property damage to appellants. *See Jennings*, 142 S.W.3d at 314.

Because the jurisdictional evidence shows there are genuine issues of material fact regarding both of Metro's arguments challenging the trial court's subject-matter jurisdiction, we sustain appellants' issues on appeal.

### CONCLUSION

Having sustained appellants' issues on appeal, we reverse the trial court's order dismissing appellants' inverse condemnation claim against Metro based on a temporary, total denial of access to their restaurant, and we remand this case to the trial court for further proceedings.


/s/    J. Brett Busby
        Justice


Panel consists of Justices Boyce, Busby, and Brown.

14