**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-19-00250-CV**
_____

**MELINDA HERRERA, Appellant**

**V.**

**WENDELL LEGACY HOMES, LLC, Appellee**

**On Appeal from the 284th District Court**
**Montgomery County, Texas**
**Trial Cause No. 17-06-06862-CV**

**OPINION**

Appellant Melinda Herrera appeals the trial court's take-nothing judgment on her claims against Wendell Legacy Homes, LLC ("Wendell Homes"). In two issues on appeal, Herrera argues that the trial court erred by failing to disregard the jury's findings of no actual damages and zero attorney's fees. We affirm the trial court's judgment.

1

BACKGROUND

In June 2017, Wendell Homes filed a breach of contract claim against Herrera seeking damages for allegedly breaching an agreement to purchase a home and pay for substantial modifications that Herrera had requested. Herrera filed counterclaims against Wendell Homes and third-party defendants Joshua Matthew Wendell ("Josh"), Blake Wilcox Properties, LLC ("Wilcox Properties"), and Marcus Howell.[1] Herrera alleged that Wendell Homes and Josh had breached the contract by failing to timely close on the home, deposit $50,000 of earnest money into an escrow account, and comply with the contract. According to Herrera, the contract provides that she could terminate the contract and receive back all the earnest money should Wendell Homes default by failing to timely close, but Wendell Homes had refused to return her earnest money.

Herrera also filed a claim for fraud in a real estate transaction against Wendell Homes, Josh, Wilcox Properties, her real estate broker, and Howell, her real estate agent. Herrera alleged that Wendell Homes, Josh, Wilcox Properties, and Howell

_____

[1]Third-party defendants Joshua Matthew Wendell, Blake Wilcox Properties, LLC ("Wilcox Properties"), and Marcus Howell are not parties to this appeal. The record reflects that during the trial, Wilcox Properties and Howell reached a settlement agreement with Herrera and Wendell Homes and that Herrera and Wendell Homes dismissed all claims against Wilcox Properties and Howell. The record further reflects that Wilcox Properties and Howell dismissed all claims against Herrera, and Herrera dismissed all her claims against Josh in his individual capacity.

2

falsely represented past or existing facts to induce her into entering an agreement to purchase the new construction of the residence and that she relied on the false statements. Herrera also alleged that Wendell Homes, Josh, Wilcox Properties and Howell falsely promised to do an act, the false promise was material, made with the intention of not fulfilling it, made for the purpose of inducing her to enter into an agreement to purchase the mineral acres, and Herrera relied on the promise to place earnest money in the proper account pursuant to the new home contract. According to Herrera, Wendell Homes, Josh, Wilcox Properties, and Howell were liable for actual and exemplary damages as well as attorney's fees under section 27.01 of the Texas Business and Commerce Code for making false representations and false promises with actual awareness of the falsity and benefiting from the same. Herrera also filed counterclaims for conspiracy to commit statutory fraud, breach of fiduciary duty, and negligent misrepresentation.

In its amended petitions, Wendell Homes alternatively sought damages under promissory estoppel and the equitable remedy of quantum meruit for the costs incurred in making Herrera's requested modifications to the home in accordance with the Americans with Disabilities Act ("ADA"). The record shows that Wendell Homes filed a motion for partial summary judgment on Herrera's claims for fraud in a real estate transaction, conspiracy to commit statutory fraud, breach of fiduciary duty, and negligence. The trial court granted Wendell Homes's motion for summary

3

judgment as to Herrera's claims for negligence, negligent misrepresentation, and breach of fiduciary duty, but denied summary judgment on Herrera's causes of action for statutory fraud and conspiracy to commit fraud, including her claim for exemplary damages. Herrera also filed a motion for summary judgment on Wendell Homes's breach of contract claim, arguing that the contract sales price was $350,000, not $400,000 as claimed by Wendell Homes, and that the contract required a $50,000 escrow payment. Herrera agreed that the sales price was $400,000, including the ADA modifications. Herrera argued that Wendell Homes could not recover under quantum meruit or promissory estoppel because there was a valid express contract. The trial court denied Herrera's motion for summary judgment.

The trial court conducted a jury trial. Herrera testified that in 2014, she was in a car accident that left her in a wheelchair, and after settling a lawsuit in 2017, she asked Howell to help her find property in Montgomery, Texas, because she wanted to build her dream home. Herrera explained that Howell and his boss, Joshua Blake Wilcox ("Wilcox"), introduced her to Josh of Wendell Homes, who helped her look at properties, but when Herrera could not find the property she wanted, Howell suggested that Herrera purchase 115 Silverwolf Cove Place ("Silverwolf Home"), a home being constructed by Wendell Homes that was approximately thirty percent complete, so that Herrera could make decisions regarding the needed ADA changes.

4

Herrera testified that before she entered into a contract to buy the Silverwolf Home from Wendell Homes, she entered into an agreement to make nine renovations to make the home ADA accessible. According to Herrera, Josh told her that she would have to pay $10,000 for the ADA changes.

Herrera testified that she wanted her attorneys to look over the agreements before she entered into them, and at Josh's request, Herrera had her attorney, David Harris, send Josh a letter stating that she had enough funds to purchase the home for $400,000. Herrera explained that after her attorney sent the letter, she gave Josh a cashier's check for $10,000, and that Howell told her to make the check payable to Wendell Homes. Herrera also explained that when she gave Josh the check, she told Josh that he was not going to take advantage of her and that she would sue him if he did anything wrong. Herrera testified that before she entered into a contract to buy the Silverwolf Home, Howell told her to wire Josh $40,000, and Herrera explained that Davis gave her legal advice before she transferred the money.

Herrera testified that she signed a contract with Wendell Homes in February 2017, which was after she agreed to have Wendell Homes make her requested ADA changes and after she paid $50,000. Herrera explained that Josh and Howell told her she had to pay $40,000 so that Josh would "hold the house." According to Herrera, Howell told her that the money was going to be placed into an escrow account, but there was no written agreement binding any party to deposit the money into an

5

escrow account. Herrera agreed that the written contract provides that she was responsible for depositing $50,000 as earnest money with Providence Title, but Herrera testified that she never made the deposit because Howell and Josh told her they were going to make the deposit. Herrera also testified that the $350,000 purchase price indicated in the written contract was incorrect, and Herrera knew that it was incorrect when she signed the contract.

Herrera explained that Wendell Homes breached the contract by failing to close on March 31, but Herrera testified that she agreed to close in May because Josh had to rehire workers to finish the sheetrock work. Herrera also testified that she was still making selections for the Silverwolf Home in April. Herrera explained that while the Silverwolf Home was being built, she purchased the Rabon Chapel property that she wanted to build on, and she did not tell Josh and Howell that she no longer wanted to buy the Silverwolf Home until after she closed on the Rabon Chapel property in May. According to Herrera, she decided not to buy the Silverwolf Home in May because "[t]here was a lot of stuff that I didn't like[,]" and the inspection showed that "it had a lot of things wrong with it." Herrera testified that on May 17, which was the same day she got the Silverwolf Home inspection report, she sent Josh a text telling him that she regretted getting the Silverwolf Home. Herrera explained that Josh and Wendell Homes tried to accommodate her requests, but she was angry with Howell.

On cross-examination, Herrera testified that she did not know that Howell was also representing Josh. Herrera explained that she believed that the $50,000 she paid would be escrowed and credited as earnest money in the contract. Herrera also explained that she understood that Josh was not going to charge her more than $400,000 for the ADA changes, and the $350,000 contract price along with the $50,000 earnest money is what she, Josh, and Howell had agreed to. According to Herrera, prior to the lawsuit, neither Josh nor Howell alleged that she was in breach of the contract for failing to pay the earnest money. Herrera testified that if the Silverwolf Home was not closed by March 31, 2017, the contract provided her the right to terminate the contract and receive the earnest money back, and she exercised her right to terminate the contract because she gave them plenty of time to finish the Silverwolf Home, but there were a lot of things wrong with it, and she "just wanted to get out." Herrera also testified that she did not receive legal advice regarding the purchase of the Silverwolf Home, and she only spoke with Harris because she needed money to make the purchase.

Herrera also explained that Josh and Wilcox tried to get her to go into business with them and to invest her money in building a subdivision on the Rabon Chapel property, but Herrera refused the deal, which she claimed was not related to her purchasing the Silverwolf Home for $400,000. Although Herrera testified that she was never told that to purchase the Silverwolf Home for $400,000, she had to let

Josh build her dream home, Herrera later testified that she had agreed to let Wendell Homes build her dream home after the Silverwolf Home was complete. Herrera explained that Howell betrayed her trust by also representing Josh and telling Josh that she did not want Josh to build her dream home because she was not satisfied with the quality of his work. Herrera also explained that she made complaints about the Silverwolf Home prior to the closing date, and in mid-April, she told Josh that she no longer wanted the Silverwolf Home because he was not complying with what she wanted. According to Herrera, she did not terminate the contract in mid-April because Josh told her he would fix it. Herrera testified that she did not give Josh a copy of the inspection report, and she did not know if Wendell Homes had an opportunity to address the issues raised in the report.

Herrera testified that she never signed any change orders to the Silverwolf Home contract. Herrera testified that she should be bound by her agreement to let Wendell Homes complete the Silverwolf Home and to build her dream home, but Herrera explained that she never signed a written agreement with Wendell Homes to build her dream home and she did not agree to buy the Silverwolf Home for less than the actual sales price. Herrera further testified that Wendell Homes does not have a claim to the $50,000 earnest money for the ADA improvements or other changes to the Silverwolf Home because the $50,000 did not apply to the construction of the home. Herrera also explained that she knew that when she was

dealing with Josh that he was acting as a representative for Wendell Homes. Herrera agreed that Wendell Homes had performed work at the Silverwolf Home, but she testified that Wendell Homes should only be paid for the work that was done correctly.

Wilcox testified that he is a real estate broker with Wilcox Properties, and Howell was one of the agents he managed. Wilcox testified that he had a limited listing agreement with Josh to list and market Wendell Homes's properties, but Wilcox Properties did not represent Wendell Homes in the contract negotiations. Wilcox explained that the transaction involving Herrera occurred before he agreed to list Wendell Homes's properties, but Wilcox Properties listed the Silverwolf Home after Josh and Herrera negotiated the terms of the contract. According to Wilcox, Howell acted as Herrera's agent and created the contract for the Silverwolf Home because Josh did not have his contract ready. Wilcox testified that Howell told him that Josh wanted to write his own Greater Houston Building Association contract ("GHBA"), which is builder specific, but Howell used the Texas Real Estate Commission ("TREC") contract because that is the contract that was available.

Wilcox explained that Howell and Herrera negotiated with Josh to specially price the Silverwolf Home for $400,000, because Josh was going to find Herrera land on which she could build her dream home. Wilcox testified that Wendell Homes is a reputable builder that builds custom homes, and the custom homebuilding

9

process takes approximately thirteen months to complete because the purchaser makes all the selections to suit her needs and tastes. According to Wilcox, builders require an upfront deposit to build a new construction home because the selections are taste specific, and if the buyer refuses to accept the property, the builder can recoup any loss. Wilcox explained that Herrera made changes to the Silverwolf Home to meet specific ADA requirements. Wilcox also explained that he had never done a contract that required the earnest money to be paid prior to the contract, and if money is exchanged prior to a contract, then there is some kind of agreement between the parties. Wilcox testified that the $50,000 Herrera paid is the earnest money listed in the contract. According to Wilcox, Josh used the money to build the home. Wilcox also explained that he never saw any signed change orders.

Wilcox further testified that he spoke with Herrera about her option to use the Rabon Chapel property for an investment opportunity to build a subdivision. According to Wilcox, his office owed Herrera a fiduciary duty and always acted according to Herrera's best interest during the Silverwolf Home transaction, and that Wilcox Properties never represented or negotiated on Josh's or Wendell Homes's behalf. Wilcox explained that he did not have a fiduciary duty to Josh and that the only duty Wilcox owed to Josh or Wendell Homes was to list and market the homes for a one percent commission. Wilcox testified that the Silverwolf Home did not close on time and that the closing date was never amended. According to Howell,

Herrera was unhappy with the inspection report and made complaints about the home prior to exercising her option to terminate the contract, and Herrera did not give Wendell Homes an opportunity to correct any issues on the report. Howell testified that after Herrera terminated the contract, his company sold the Silverwolf Home for $460,000.

Howell testified that he was working as Herrera's agent and looking for property for Herrera when Wilcox introduced him to Josh of Wendell Homes. Howell explained that Herrera agreed to buy the Silverwolf Home after she and Josh entered into an agreement to have Wendell Homes make ADA renovations to the Silverwolf Home. Howell also explained that the $10,000 was for the ADA changes and to hold the house. Howell testified that he prepared the sales contract, but he did not instruct Herrera to wire $40,000 to Josh. Howell explained that he told Herrera to consult with her attorney, and Howell knew that Herrera was in constant communication with her attorneys. Howell also explained that he represented Herrera during the purchase of the Rabon Chapel property, and according to Howell, Herrera's attorney called him and asked about Wendell Homes and the price of the Rabon Chapel property. Howell testified that he did not conduct any contract negotiations on behalf of Wendell Homes, and that he only represented Herrera's interests.

Howell explained that he heard Herrera and Josh agree that she would purchase the Silverwolf Home from Wendell Homes for a special rate, that Wendell Homes would make the ADA changes, and that Wendell Homes would build Herrera's dream home when she found property. According to Howell, the agreement was not in the contract because "[i]t was a handshake[,]" and the agreement to build another house was never put in an addendum. Howell further testified that the contract was supposed to be amended to reflect the $400,000 sales price and the deposits, but the contract was never amended. Howell testified that he understood that Josh used the money Herrera paid him to complete the home. Howell explained that shortly after Herrera closed on the Rabon Chapel property, he told Herrera she had $27,351.09 in overages for the selections she made on the Silverwolf Home, and Herrera told him she did not think so and that she was going to get her attorney to look at it. Howell explained that the contract provided that any change orders or overages had to be signed by Wendell Homes and Herrera to be enforceable, and Howell testified he never saw any change orders that were agreed to and signed by Herrera. According to Howell, two days after he told Herrera about the overages, Herrera decided that she did not want the Silverwolf Home because Wendell Homes failed to close on time. Howell testified although Herrera had a right to terminate the contract, he advised Herrera not to terminate the contract because Wendell Homes had done work on the home, and she could lose her money.

12

Josh testified that he operates and manages Wendell Homes, which specializes in designing and building custom homes. Josh testified that in January 2017, he met with Herrera, Wilcox, and Howell to discuss Herrera's plan to buy property and build a home in Montgomery County. Josh testified that when he found out that Herrera was looking for an ADA home to rent, he showed Herrera the Silverwolf Home that was under construction, and Josh told Herrera that he could make some adjustments to fit her needs. Josh explained that Herrera agreed to buy the Silverwolf Home for $400,000, and on January 5, 2017, Josh agreed to complete Herrera's specific requests to make the home ADA compliant.

According to Josh, he told Herrera that his standard deposit is $10,000 to take the house off the market and that he always requires a ten percent builder's deposit when changes are requested to guarantee payment for the changes. Josh testified that Herrera paid the $10,000 deposit to hold the home before they entered into a contract, and when Herrera handed him the $10,000 cashier's check payable to Wendell Homes, she told him if anything went wrong, she would sue him. Josh explained that Wendell Homes had to fund Herrera's requested changes, and when he received the $10,000, he began working on Herrera's changes. Josh further explained that there were many changes that needed to be made to accommodate Herrera's ADA requests for the Silverwolf Home, and since the Silverwolf Home was not going to be Herrera's permanent home, the changes needed to be made in a

fashion that could be quickly undone because some ADA modifications are unattractive to buyers. According to Josh, Herrera also wired $40,000 to Wendell Homes before they had a contract.

Josh testified that he wanted to use the GHBA contract, but he agreed to let Howell prepare a TREC contract, which Herrera signed on February 13, 2017. Josh explained that after he accidently signed the contract electronically, he immediately notified Howell that the contract included the wrong price and that it did not show the deposits, and Howell told him that he would amend the contract. According to Josh, the price should have been $400,000, and the contract should have included the $10,000 hold deposit and the ten percent builder's deposit, but Howell never amended the contract. Josh explained that the custom-building industry does not deal with escrow because any deposits are used to make changes to build a "one-off home[]" that is unlike any other.

Josh testified that he got confirmation from Herrera before installing her selections in the Silverwolf Home, and Herrera's selections amounted to overages totaling $27,351.09. Josh also testified that the overages from Herrera's selections were not signed by Herrera. Josh explained that Herrera had made some complaints before she told him that she did not want the Silverwolf Home, but Herrera had never complained about the construction being behind schedule. Josh further explained that Howell told him that Herrera was terminating the contract in mid-May right

14

before closing, and Josh testified that Herrera never provided an explanation or gave him an opportunity to address any issues with the inspection report. Josh testified that he did everything he could to assist Herrera and that he wanted to do things right because her story tugged on his heartstrings.

According to Josh, he sued Herrera because Wendell Homes did work that Herrera did not pay for, and it cost $59,854.80 for Wendell Homes to reverse everything and put the Silverwolf Home back into sellable form after Herrera walked away. Josh testified that he sold the Silverwolf Home for $460,000 after adding a workshop in the garage and a second story, which included a game room, study, full bath, and a full staircase. Josh agreed that the damages he was seeking are not consistent with the terms of the contract. Josh also testified that he passed on the opportunity to buy the Rabon Chapel property before Herrera purchased it. Josh explained that he talked with Herrera about development opportunities for the Rabon Chapel property, but Josh claimed that he did not pressure Herrera in any way or receive any commission from the sale.

Harris testified that he sent a letter to Josh confirming that Herrera had $400,000 to purchase the Silverwolf Home. Harris testified that he did not have any discussions with Josh about earnest money or a construction deposit. Harris further testified that he never reviewed the real estate contract or discussed the contract with Josh or Herrera.

15

The record shows that Wendell Homes and Herrera agreed to submit affidavits regarding their requests for attorney's fees and that Herrera's attorney, Reynaldo A. Pena, requested that the attorney's fees be segregated. Herrera also moved for a directed verdict on her breach of contract claim, and the trial court denied Herrera's motion. The jury returned a verdict finding that there was a new home contract between Wendell Homes and Herrera, Herrera did not fail to comply with the agreement, and Wendell Homes failed to comply with the agreement. The jury awarded Herrera zero damages resulting from Wendell Homes's failure to comply with the agreement. The jury found that Wendell Homes did not perform compensable work for Herrera for which it was not compensated, Herrera promised to pay for the ADA modifications and upgrades to the property, Herrera reasonably foresaw that Wendell Homes would rely on her promise to pay for the modifications and upgrades, Wendell Homes substantially relied on Herrera's promise and made some, if not all, of the requested modifications and upgrades, and that the reasonable value of Wendell Homes's compensable work and services based on Herrera's promise on which it substantially relied in performing was zero.

The jury also found that Wendell Homes committed fraud against Herrera by making a false promise to do an act, that zero dollars would fairly and reasonably compensate Herrera for any damages that were proximately cause by such fraud, and that Wendell Homes did not have actual awareness of the falsity of the promise. The

16

jury further found that Wendell Homes did not intentionally misapply the $50,000 Herrera paid in a manner that involved substantial risk of loss to Herrera, secure the execution of a document by deception, or make a negligent misrepresentation on which Herrera justifiably relied. The jury found that a reasonable fee for the necessary services of both Wendell Homes's and Herrera's attorneys was zero.

After the jury returned its verdict, Herrera filed a motion to disregard the jury findings and enter judgment. In a written motion for judgment notwithstanding the verdict ("JNOV"), Herrera argued that no evidence supports the jury's findings of zero damages on her claims for breach of contract and statutory fraud because the undisputed evidence shows that she paid Wendell Homes $50,000. Herrera argued that the trial court should disregard the jury's finding of zero damages and find that, as a matter of law, she suffered damages of $50,000, which is the amount she paid to Wendell Homes under the contract. Herrera further contended that as a prevailing party on her statutory fraud and breach of contract claims, she is entitled to attorney's fees. Herrera also asserted that the trial court should disregard the jury's findings as to promissory estoppel because Wendell Homes cannot recover under promissory estoppel when the jury found that a contract exists between the parties.

Wendell Homes also filed a motion to disregard the jury findings and enter judgment as well as a response to Herrera's motion, arguing that the evidence submitted in total supports the jury's verdict of zero damages and zero attorney's

17

fees as to Herrera. Wendell Homes argued that the trial court should disregard the jury's fraud finding because the record contains no evidence that Wendell Homes made any representations of material fact that induced Herrera to enter into the contract. According to Wendell Homes, the actions about which Herrera complains all occurred after Herrera entered into the contract. Wendell Homes also argued that Herrera failed to meet her burden of proof on all the elements of fraud because injury and damages are elements of fraud, and the jury awarded Herrera zero damages. Wendell Homes further argued that the jury's findings regarding its claims for quantum meruit and promissory estoppel also supports its request to disregard the jury's fraud finding because the great weight of the evidence shows that Herrera knew what Wendell Homes used the money for and that Herrera did not rely on any representations to the contrary to enter into the contract. The trial court rendered a final judgment ordering that Wendell Homes take nothing on its claims against Herrera and that Herrera take nothing on her claims against Wendell Homes and Josh.

## ANALYSIS

In issue one, Herrera argues that the trial court erred by failing to disregard the jury's findings of no actual damages because she established $50,000 in actual damages as a matter of law. In issue two, Herrera argues that the trial court erred by failing to disregard the jury's findings of zero attorneys' fees because she prevailed

18

against Wendell Homes's breach of contract claim for which Wendell Homes received zero damages. According to Herrera, Pena's affidavit provides undisputed evidence that the attorney's fees she incurred were reasonable and necessary, and since Wendell Homes failed to challenge Pena's affidavit, her evidence of attorney's fees must be taken as true as a matter of law.

Appellate courts review a trial court's decision on a motion for JNOV under a legal-sufficiency standard. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). Under this standard, appellate courts must view the evidence in the light most favorable to the jury's verdict, indulging every reasonable inference that would support the jury's verdict. *Id.* at 822. In a legal-sufficiency review, appellate courts must credit evidence that supports the verdict if reasonable jurors could do so and disregard contrary evidence unless reasonable jurors could not. *Id.* at 827. We will uphold the jury's finding if more than a scintilla of competent evidence supports it. *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009).

"When a party that bore the burden of proof at trial seeks a judgment notwithstanding the verdict, it must show that the record establishes as a matter of law a proposition that contradicts the jury's finding." *Ginn v. NCI Bldg. Sys., Inc.*, 472 S.W.3d 802, 843 (Tex. App.—Houston [1st Dist.] 2015, no pet.). Stated another way, "'[a] trial court may not properly disregard a jury's negative finding and substitute its own affirmative finding unless the evidence conclusively establishes

the issue.'" *Id.* (quoting *Henry v. Masson*, 333 S.W.3d 825, 849 (Tex. App.—Houston [1st Dist.] 2015, no pet.)). "[E]vidence is conclusive only if reasonable people could not differ in their conclusions, a matter that depends on the facts of each case." *City of Keller*, 168 S.W.3d at 816. We must first examine the record for any evidence supporting the jury's finding while ignoring all evidence to the contrary. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). If there is no evidence to support the challenged finding, we must then examine the entire record to determine whether the contrary proposition is established as a matter of law. *Id.*

## ZERO ACTUAL DAMAGES

In issue one, Herrera contends that the jury answered "0" to the damages question premised on a finding that Wendell Homes breached the contract despite the undisputed evidence that Herrera paid $50,000 pursuant to the new home contract. Herrera also complains that despite the jury determining that Wendell Homes committed fraud in the sale of real estate against her, the jury answered "0" as to the amounts she paid pursuant to the contract. According to Herrera, the trial court erred in failing to disregard the jury's findings of no actual damages because she established $50,000 in damages as a matter of law. Wendell Homes argues that while Herrera demonstrated that she made a $50,000 deposit under the new home contract and that Wendell Homes breached the contract, Herrera ignores the fact that Wendell Homes prevailed against her on its promissory estoppel claim. According

20

to Wendell Homes, since there was extensive evidence that it spent the $50,000 to make the ADA modifications and to undo the modifications after Herrera terminated the contract, the jury could have considered the amounts Herrera avoided under the contract and the harm Herrera caused Wendell Homes in determining the amount of damages Herrera was entitled to recover.

Reading the jury's answers collectively as a whole, we conclude that the jury's findings of zero damages for Herrera can be reconciled with its findings in favor of Wendell Homes's promissory estoppel claim. The jury answered the charge as follows:

- The jury answered "Yes" in the response to Question No. 1, which asked: "Was the New Home Contract a contract between Wendell Legacy Homes, LLC and Melinda Herrera regarding the Property?" Based on the "Yes" answer to Question 1, the jury answered Questions 2 and 3.

- The jury answered "No" to Question No. 2, which asked: "Did Melinda Herrera fail to comply with the agreement as found by you in Question 1?"

- The jury answered "Yes" to Question No. 3, which asked: "Did Wendell Legacy Homes fail to comply with the agreement as found by you in Question 1?" Based on the "No" answer to Question 2 and the "Yes" answer to Question 3, the jury did not answer Question 4, 5 and 6.

- The jury answered "0" to Question 7, which asked: "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Melinda Herrera for her damages, if any, that resulted from Wendell Legacy Homes, LLC's failure to comply as found by you in Question 3?" The jury was instructed to consider the following element of damages if any: "any amounts Melinda Herrera paid pursuant to the New Home Contract."

21

- The jury answered "No" to Question 8, which asked: "Did Wendell Legacy Homes, LLC perform compensable work for Melinda Herrera for which it was not compensated?" Based on the "No" answer, the jury was instructed not to answer Question 9.

- The jury answered "Yes" to Question 10, which asked: "Did Melinda Herrera promise that she would pay for the [ADA] modifications and upgrades to the Property?"

- The jury answered "Yes" to Question 11, which asked: "Did Melinda Herrera reasonable foresee that Wendell Legacy Homes would rely on her promise to pay for these ADA medications and upgrades to the Property?"

- The jury answered "Yes" to Question 12, which asked: "Did Wendell Legacy Homes substantially rely on Melinda Herrera's promise and make some, if not all, the requested ADA modifications and upgrades to the Property?"

- The jury answered "0" to Question 13, which asked: "What is the reasonable value of Wendell Legacy Homes, LLC's compensable work and services based on Melinda Herrera's promise for which it substantially relied in performing?"

- The jury answered "No" to Question 13.1, which asked: "Do you find that Wendell Legacy Homes, LLC has been unjustly enriched and that Melinda Herrera would be unjustly penalized if Wendell Legacy Homes, LLC was permitted to retain the benefits of its actions without paying or providing anything in return?"

- The jury answered "Yes" to Question 14A, which asked: "Did Wendell Legacy Homes, LLC commit fraud against Melinda Herrera?" Question 14A instructed the jury that fraud occurs when (1) a party makes a false promise to do an act; and (2) that promise is material; and (3) the promise is made with the intention of not fulfilling it; and (4) the promise is made to a person for the purpose of inducing that person to enter into a contract; and (5) that person relies on the promise in entering into that contract.

- The jury answered "No" to Question 14B, which asked: "Did Wendell Legacy Homes, LLC commit fraud against Melinda Herrera?" Question 14B instructed the jury that fraud occurs when (1) there is a false representation of

22

a past or existing material fact; and (2) the representation is made to a person for the purpose of inducing the person to enter into a contract; and (3) the representation is relied on by that person in entering into that contract. Based on the "Yes" answer to Question 14A, the jury was instructed to answer Questions 16 and 17.

- The jury answered "0" to Question 16, which asked: "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Melinda Herrera for her damages, if any, that were proximately caused by such fraud?" The jury was instructed to consider the following elements of damages: "[a]ny amounts Melinda Herrera paid pursuant to the New Home Contract."

- The jury answered "No" to Question 17, which asked: "Did Wendell Legacy Homes, LLC have actual awareness of the falsity of the representation or promise you found to be fraud in Question 14?" Based on the "No" answer to Question 17, the jury was instructed not to answer Question 18.

- The jury answered "No" to Question 19.1, which asked: "Did Wendell Legacy Homes, LLC . . . intentionally misapply the $50,000 Melinda Herrera paid in a manner that involved substantial risk of loss to Melinda Herrera?" The charge instructed the jury that "'[m]isapply' means a person deals with the money contrary to an agreement under which the person hold[s] the money."

- The jury answered "No" to Question 19.2, which asked: "Did Wendell Legacy Homes, LLC . . . secure the execution of a document by deception?" The charge instructed the jury that "'[s]ecuring the execution of a document by deception' occurs when a person causes another person to sign any document affecting property, and does so by deception, with the intent to defraud or harm any person."

- The jury answered "No" to Question 20, which asked: "Did Wendell Legacy Homes, LLC make a negligent misrepresentation on which Melinda Herrera justifiably relied?" Based on the "No" answer to Question 20, the jury was instructed not to answer Question 21.

23

Although promissory estoppel does not apply to a promise covered by a valid contract between the parties, it does apply to a promise outside the contract. *Trevino & Assocs. Mech., L.P. v. Frost Nat'l Bank*, 400 S.W.3d 139, 146 (Tex. App.—Dallas 2013, no pet.). Wendell Homes asserted a promissory estoppel claim for the money it spent making Herrera's requested ADA modifications and upgrades to the home. The jury found that Wendell Homes was entitled to recover on its promissory estoppel claim after considering evidence that Wendell Homes had performed Herrera's requested ADA modifications that were not covered by the contract, and that Herrera had promised to pay for the modifications. The jury heard Herrera testify that before she entered into a contract to buy the Silverwolf Home, she entered into an agreement to make nine renovations to make the home ADA accessible and paid $50,000 to Wendell Homes. The jury heard Herrera testify that Wendell Homes had performed work at the Silverwolf Home and that Wendell Homes should only be paid for the work that was done correctly.

The jury considered Howell's testimony that Herrera agreed to buy the Silverwolf Home after she and Josh entered into an agreement to have Wendell Homes make ADA renovations to the Silverwolf Home. The jury heard Howell testify that Josh used the money Herrera paid to complete the home, and that Howell advised Herrera not to terminate the contract because she could lose the money that Wendell Homes used to complete the work on the home. The jury also heard Wilcox

24

testify that Herrera made changes to the Silverwolf Home to meet specific ADA requirements and that Josh used the $50,000 to build the Silverwolf Home.

The jury considered Josh's testimony that prior to entering into a contract, he agreed to complete Herrera's specific requests to make the home ADA compliant and that Wendell Homes had to fund Herrera's requested modifications. The jury heard Josh testify that Herrera paid $50,000 before signing the contract, and that he used the funds to begin working on Herrera's modifications. The jury also heard Josh testify that Wendell Homes did work that Herrera did not pay for, and it cost Wendell Homes $59,854.80 to reverse the ADA modifications that Herrera requested and to put the Silverwolf Home back into sellable form after Herrera walked away.

Even though the jury found in favor of Herrera on her breach of contract claim, the jury also found that (1) Herrera promised to pay for the ADA modifications, (2) Wendell Homes made the modifications, and (3) Wendell Homes was not unjustly enriched and Herrera was not unjustly penalized by permitting Wendell Homes to retain the benefits of its actions without paying anything in return. The evidence showed that Herrera had already paid $50,000 and that Wendell Homes had used Herrera's funds to make Herrera's modifications, and the jury found that the value of the work that Wendell Homes performed was zero. Based on the jury's finding that Wendell Homes was not entitled to any damages on its

promissory estoppel claim, it follows that the jury also found that Herrera was entitled to zero damages on her breach of contract claim based on Wendell Homes's failure to timely close, because the goal in determining damages for a breach of a contract claim is just compensation for any loss or damages actually sustained due to the breach. *See Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991).

Additionally, although the jury found in favor of Herrera on her fraud claim by finding that Wendell Homes had made a false promise, the jury also found that Wendell Homes did not have actual awareness of the falsity of its promise. We conclude that the jury's refusal to award Herrera damages for fraud can be reconciled with its finding that Wendell Homes did not intentionally misapply the $50,000 Herrera paid and its finding of zero damages for Wendell Homes's promissory estoppel claim. Predicated on those findings, the jury considered what damages to award Herrera on her fraud claim, and the jury awarded zero damages.

Applying the first step of the conclusively-established-as-a-matter-of-law-legal-sufficiency-analysis and examining the record for any evidence supporting the jury's finding of zero damages for Herrera's breach of contract and fraud claims, we hold that some evidence exists from which the jury, as the sole judge and credibility of the witnesses, could have determined that Herrera suffered zero damages. *See City of Keller*, 168 S.W.3d at 822-23; *Francis*, 46 S.W.3d at 241. Since some evidence supports the award of zero damages, Herrera has failed to conclusively establish

26

entitlement to $50,000 in damages as a matter of law. *See Francis*, 46 S.W.3d at 241; *Ginn*, 472 S.W.3d at 843; *Masson*, 333 S.W.3d at 849. Therefore, the trial court did not err by refusing to disregard the jury's findings of no actual damages. We overrule issue one.

ZERO ATTORNEY'S FEES

In issue two, Herrera argues that the trial court erred by failing to disregard the jury's findings of zero for a reasonable fee for the necessary services of Herrera's attorneys in their case. According to Herrera, she is entitled to recover attorney's fees under section 27.01 of the Texas Business and Commerce Code and as a prevailing party under the contract. *See* Tex. Bus. & Com. Code Ann. § 27.01(e). Herrera contends that Pena's affidavit provides undisputed evidence that the attorney's fees she incurred were reasonable and necessary, and since Wendell Homes failed to challenge her evidence of attorney's fees, Pena's affidavit must be taken as true as a matter of law.

Generally, attorney's fees incurred by a party are not recoverable against an adversary in a breach of contract case unless provided by statute or contract between the parties. *In re Nat'l Lloyds Ins. Co.*, 532 S.W.3d 794, 809 (Tex. 2017); *Turner v. Turner*, 385 S.W.2d 230, 233 (Tex. 1964). The parties' new home contract provided for the award of attorney's fees. The attorney's fees section of the new home contract provides that "[a] Buyer, Seller, Listing Broker, Other Broker, or escrow agent who

27

prevails in any legal proceeding relating to this contract is entitled to recover reasonable attorney's fees and all costs of such proceeding." Section 27.01 of the Texas Business and Commerce Code, which concerns fraud in real estate and stock transactions, also provides that "[a]ny person who violates the provisions of this section shall be liable to the person defrauded for reasonable and necessary attorney's fees[.]" *See* Tex. Bus. & Com. Code Ann. § 27.01(e).

When attorney's fees are recoverable under contract as a prevailing party or by statute, the party seeking to recover those fees bears the burden to establish that the fees were reasonably incurred and necessary to the prosecution of the case. *In re Nat'l Lloyds Ins. Co.*, 532 S.W.3d at 809; *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 819 (Tex. 1997). Ordinarily, determining the amount of reasonable and necessary attorney's fees presents questions of fact, so the trier of fact must resolve disputes over attorney's fees. *Garcia v. Gomez*, 319 S.W.3d 638, 642 (Tex. 2010); *see also Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 881 (Tex. 1990). Generally, the testimony of an interested witness, even when uncontradicted, merely raises an issue of fact, leaving the amount of the fees that should be awarded up to the jury when the parties elect to have a jury decide the dispute. *Smith v. Patrick W. Y. Tam. Tr.*, 296 S.W.3d 545, 547 (Tex. 2009). In some circumstances, however, the testimony of an interested witness, when the testimony "is not contradicted by any other witness, or attendant circumstances, and the same

28

is clear, direct and positive, and free from contradiction, inaccuracies, and circumstances tending to cast suspicion thereon, it is taken as true, as a matter of law." *Ragsdale*, 801 S.W.2d at 882. However, "[e]ven uncontroverted expert testimony does not bind jurors unless the subject matter is one for experts alone." *City of Keller*, 168 S.W.3d at 820. Thus, if Pena's uncontradicted testimony was "unreasonable, incredible, or its belief is questionable," then his testimony raised only a fact issue leaving the amount Herrera was entitled to recover up to the jury. *See Ragsdale*, 801 S.W.2d at 882.

Wendell Homes argues that Herrera's proof of attorney's fees is insufficient to recover under section 27.01 because Pena's affidavit is too vague and conclusory to support an award for attorney's fees on Herrera's fraud claim. Wendell Homes argues that Herrera's proof of attorney's fees fails to show that the fees are reasonable and necessary because Pena's affidavit includes all the fees incurred by Herrera, including fees incurred on other claims that were dismissed by summary judgment and as to other parties that had settled during trial. Wendell Homes further argues that Pena's affidavit and the attached invoices lack specific details and explanations referencing the statutory fraud claim that would allow the jury to calculate what fees were reasonable and necessary for the prosecution of Herrera's fraud claim. Wendell Homes contends that the jury was free to review Pena's affidavit and determine whether it was too vague and conclusory to support an award

for Herrera's fraud claim, and "it is apparent that the short affidavit on fees submitted to the jury failed to convince the jury that the approximately $87,000 in attorney's fees allegedly incurred by Herrera were reasonable or necessary, particularly in light of the jury's award of zero damages."

To show the reasonableness and necessity of attorney's fees, a party must show that the fees were incurred while suing the defendant sought to be charged with the fees on a claim which allows recovery of such fees. *See Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex. 1991). This is especially important in cases where there are multiple defendants and one or more of the defendants have settled because the remaining defendant should not be charged fees for which it is not responsible. *See id.* at 11. Based on the attendant circumstances, we conclude that Pena's affidavit stating that his attorney's fees are reasonable and necessary is not clear, direct, positive, and free from contradiction, inaccuracies, and circumstances tending to cast suspicion on it. *See Ragsdale*, 801 S.W.2d at 882. We conclude that Pena's affidavit is conclusory as to the reasonable and necessary attorney's fees regarding Herrera's fraud claim because it fails to provide underlying facts to support Pena's conclusion. *See Leonard v. Knight*, 551 S.W.3d 905, 911-12 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *Padilla v. Metro. Transit Auth. of Harris Cty.*, 497 S.W.3d 78, 86 (Tex. App.—Houston [14th Dist.] 2016, no pet.). Accordingly, Herrera failed to establish that she is entitled to recover attorney's fees under section 27.01 as a matter

30

of law. *See* Tex. Bus. & Comm. Code Ann. § 27.01(e); *Ginn*, 472 S.W.3d at 843; *Masson*, 333 S.W.3d at 849.

Herrera also argues that she established as a matter of law that she is entitled to recover attorney's fees as a prevailing party under the contract, because she successfully defended against Wendell Homes's breach of contract claim for which Wendell Homes received a take-nothing judgment. In support of her argument that a prevailing party refers to a party who is successful in defending an action on the main issue, Herrera cites *Weng Enterprises, Inc. v. Embassy World Travel, Inc.*, 837 S.W.2d 217, 222-23 (Tex. App.—Houston [1st Dist.] 1992, no writ). Wendell Homes argues that *Weng* is distinguishable, and since Herrera also received a take-nothing judgment, this Court should follow the case law that governs when neither party prevails. *See Walnut Retail Ctr. Gen. Partner, LC, v. LBL, Ltd.*, No. 04-13-00878-CV, 2014 WL 5463898, at *3-4 (Tex. App.—San Antonio Oct. 29, 2014, no pet.) (mem. op.). Wendell Homes argues that the holding in *Walnut* is consistent with other established case law which provides that to be a prevailing party, a party "'must obtain actual and meaningful relief, something that materially alters the parties' legal relationship.'" *Id.* at *3 (quoting *Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 652 (Tex. 2009)). In other words, "a plaintiff must prove compensable injury and secure an enforceable judgment in the form of damages or equitable relief." *Intercontinental*, 295 S.W.3d at 652.

The contract provides that the "prevailing party in any legal proceedings brought in relation to this Contract may be entitled to recover from the non-prevailing party all litigation costs and reasonable and necessary attorney's fees." Since the contract does not define the term "prevailing party," in interpreting the contract, we presume the parties intended the term's ordinary meaning. *See id.* at 653. A party prevails when it secures an enforceable judgment in the form of damages for its injuries which materially alters the legal relationship of the parties. *See id.* at 652.

The Texas Supreme Court has determined that a defendant is a prevailing party when it obtains actual and meaningful relief that materially alters the parties' legal relationship by successfully defending against a claim and securing a take-nothing judgment on the main issue in the case. *See Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 485-86 (Tex. 2019). However, we conclude that *Rohrmoos* is distinguishable because, unlike this case, in *Rohrmoos*, the plaintiff successfully defended against a breach of contract counterclaim in which no monetary damages were sought in the jury charge, and the trial court's judgment altered the legal relationship of the parties by awarding declaratory relief that allowed the plaintiff/counter-defendant to terminate the commercial lease. *See id.* at 476-77, 484-86. We also note that the *Intercontinental* Court only addressed what a plaintiff must do to be a prevailing party and other appellate courts have determined

that *Intercontinental* is inapplicable to determining whether a defendant who successfully defended a claim is a prevailing party under the parties' agreement. We agree with Wendell Homes that the holding in *Walnut* controls in a case such as this one, in which both parties received take-nothing judgments and the trial court's judgment did not alter the parties' legal relationship. *See id.* at 486; *Intercontinental*, 295 S.W.3d at 656-57; *Walnut*, 2014 WL 5463898, at *3-4; *see also Fitzgerald v. Schroeder Ventures II, LLC*, 345 S.W.3d 624, 629 (Tex. App.—San Antonio 2011, no pet.); *Silver Lion, Inc. v. Dolphin Street, Inc.*, No. 01-07-00370-CV, 2010 WL 2025749, at *18 (Tex. App.—Houston [1st Dist.] May 20, 2010, pet. denied).

In this case, Herrera successfully defended against Wendell Homes's claim for breach of contract, and Wendell Homes received a take-nothing judgment, which did not include any relief that altered the legal relationship of the parties. Additionally, in resolving Herrera's counterclaim for breach of contract, the jury found that Wendell Homes failed to comply with the new home contract, but the jury awarded Herrera zero damages for Wendell Homes's breach. The jury further found that a reasonable fee for the necessary services of both Wendell Homes's and Herrera's attorneys was zero. In determining whether attorney's fees are proper, we must consider the judgment, not the verdict. *Intercontinental*, 295 S.W.3d at 656-57. "A stand-alone finding on breach confers no benefit whatsoever[,]" and an award of zero damages "necessarily zeroes out" prevailing party status. *Id.* at 655-56. "[T]o

33

prevail in a suit that seeks only actual damages–compensation for provable economic harm–there must be a showing that the plaintiff was actually harmed, not merely wronged." *Id.* at 656.

Since this case resulted in a take-nothing judgment with no meaningful judicial relief for Herrera, we conclude that Herrera cannot be deemed a prevailing party under the contract. *See id.* at 656-67. We further conclude that Herrera has failed to establish as a matter of law that she is entitled to recover attorney's fees as a prevailing party under the contract. *See Ginn*, 472 S.W.3d at 843; *Masson*, 333 S.W.3d at 849. Accordingly, since Herrera failed to establish as a matter of law that she is entitled to recover attorney's fees under section 27.01 or as a prevailing party under the contract, the trial court did not err by failing to disregard the jury's findings of zero attorney's fees. We overrule issue two. Having overruled both of Herrera's issues, we affirm the trial court's judgment.

AFFIRMED.

_____
W. SCOTT GOLEMON
Chief Justice

Submitted on May 6, 2021
Opinion Delivered July 29, 2021

Before Golemon, C.J., Kreger and Horton, JJ.

34